STATE of Missouri, Respondent,

v.

Robert ENDRES, Appellant.

No. 46794.

Missouri Court of Appeals,
Eastern District,
Division Two.

Sept. 3, 1985.

Motion for Rehearing and/or Transfer
Denied Oct. 3, 1985.

William L. Webster, Mary Elise Burnett, Jefferson City, for respondent.

Kathryn Shubik, St. Louis, for appellant.

SIMON, Presiding Judge.

Robert Endres, appellant, was found guilty by a jury of capital murder, § 565.-001 RSMo 1978, for the death of John Sanborn and sentenced to life imprisonment without possibility of parole for fifty years. In a companion case *State of Missouri v. Robert Endres*, 699 S.W.2d 1 (Mo.App.1985), appellant's robbery conviction growing out of the same incident was affirmed. On appeal, appellant contends that the trial court erred in: (1) denying his motion for a new trial in that a juror concealed prejudicial information concerning personal biases during voir dire examination; (2) denying his motion for acquittal at the close of the evidence in that the state failed to prove the elements of capital murder. We reverse and remand.

We view the evidence in a light favorable to the verdict. At approximately 8:45 p.m. on August 1, 1981, Mr. and Mrs. Evans and Mr. and Mrs. Wolf went to a tavern known as J & J's Famous Bar at Mardel and Kingshighway. Both couples arrived in the same car and parked at the rear of the tavern on Mardel, close to the boarded up back door. Inside the bar, the back door is across from the men's restroom. As the couples were getting out of their car three of the four persons heard a popping noise. The two couples proceeded to the front door of the bar. As they entered the bar, the only person they saw was appellant standing halfway down the bar on the customer's side. He appeared to be picking something up from the bar. As the two couples entered the bar, he walked hurriedly by them brushing against Mr. Wolf and pushing him against the cigarette machine. As appellant was leaving he mumbled something about being right back.

He then walked briskly across Kingshighway to the east side of the street. He

looked back a couple times and then began to run north on Kingshighway. Another customer, James Fields, arrived and entered the bar at this time. Mr. Fields and Mrs. Evans then noticed that the cash register was open and that it was empty. Mr. Fields began to look for the bartender, John Sanborn. Mr. Fields found John Sanborn lying in the men's room with a gunshot wound to his head and his body was still twitching. Sanborn also had a laceration on the right side of his head. The gunshot wound was inflicted from the back. The laceration was caused by striking something flat and hard, such as the floor. Mr. Fields called the police.

The Evans and Wolfs gave a description of the person who had been leaving as they arrived. They described him as a white male in his forties between 5'8" and 5'10", grayish hair, black pants and a dark blue shirt. This description was broadcast by the police dispatcher. Officers Mueller and Greishaber of the St. Louis Police Department responded to the call and saw appellant, who matched the description, briskly walking north on the east side of Kingshighway, five blocks from the bar.

The officers stopped appellant and a search was conducted which revealed a .22 caliber gun which was hidden under appellant's shirt. The gun contained three live cartridges and three spent cartridges. The officers also found sixty-eight dollars in appellant's right hand pocket including approximately thirty (30) one dollar bills.

Appellant was taken back to the bar where he was identified by the four witnesses as the man they saw leaving the bar when they had entered. Appellant was identified again in a line-up thirteen months after the incident.

An investigation revealed that John Sanborn had been shot in the head in the men's restroom. Later analysis led to the conclusion that the bullet fragments recovered from Sanborn's head were consistent with the gun recovered from appellant.

Two bullet holes were empty in the bathroom wall and Sanborn's wallet was found empty in the washbasin. The cartridges found in appellant's gun were consistent with the fragments found in the wall. The lubaloy coating found on the cartridges in appellant's gun matched that found on fragments from the wall.

A money clip found near the center of the bar where witnesses first observed appellant when they entered the bar was identified as Sanborn's. A drink was found nearly full and still contained ice and was positioned about halfway down the bar. A half empty drink was positioned at the end of the bar next to a burning cigarette, where Sanborn normally sat to watch television. A fingerprint analysis found Sanborn's print on the half empty drink.

During voir dire the prosecutor asked this question of the panel: "My next question, we're going to do it the same way and the question is, have you or anybody close in your family or a very, very good friend, well, let's make it you or anybody in your family been a victim of a crime?" Numerous members of the panel responded, mentioning themselves, husband, daughter, son, brother-in-law, mother, and boyfriend. Juror number nine, Bernice Anderson, failed to respond to this question. After the trial, it was discovered that Bernice Anderson had a half-brother who had been murdered by shooting approximately six weeks prior to her jury duty. She and her half-brother had a common father but different mothers.

At trial, a letter, written by appellant and addressed to a Ms. Shirley Schmidt, was introduced. In this letter, appellant discussed being at the bar and made various comments on the evidence.

At the close of the evidence, the jury returned a verdict of guilty of capital murder.

Initially, we shall consider appellant's second point wherein he contends the evidence was insufficient to prove deliberation, a necessary element of capital murder.

◼ In ruling on the sufficiency of evidence, we consider the facts and all favor-

able inferences reasonably drawn therefrom in the light most favorable to the jury's verdict and disregard all contrary evidence and inferences. *State v. McDonald*, 661 S.W.2d 497, 500[1] (Mo. banc 1983). Further, the state need not produce direct evidence of a defendant's deliberation, rather the mental elements necessary for murder may be proved by indirect evidence and inferences reasonably drawn from circumstances surrounding the killing. *State v. Nelson*, 514 S.W.2d 581, 582[1] (Mo.1974). Direct proof of the requisite mental state is seldom available and is usually inferred from circumstantial evidence.

■■■ Deliberation is a necessary element of capital murder and the distinguishing element between capital murder and second degree murder. *State v. Gilmore*, 650 S.W.2d 627, 629[4–6] (Mo. banc 1983). Deliberation is found when an act of killing is performed with a cool and deliberate state of mind. *State v. Strickland*, 609 S.W.2d 392, 394 (Mo. banc 1980).

In the present case there was substantial circumstantial evidence of deliberation. The jury could have concluded that appellant had possessed the gun before entering the bar with the intention to do violence. The evidence shows that Sanborn was shot in the men's room while apparently no one was in the bar except the appellant and Sanborn, allowing a reasonable inference that appellant had planned to carry out the act before entering the bar and waited for just the right time when no witnesses were present. The location of the fatal gunshot wound was above the ear on the left side to the rear of the head. The evidence shows no indication of a struggle in the public area of the bar. Following the shooting, appellant displayed no signs of having been in a struggle and displayed a cool and rational mind and nonchalantly walked out of the bar, mumbling something about being right back. After robbing and shooting Sanborn, he took painstaking measures to cover up the murder by waiting for the bar to be empty, killing him in the bathroom and closing the door afterward to conceal him. Furthermore, he walked out of the bar as the two couples were entering and after crossing the street, began to run.

■■ Although this evidence is circumstantial, we believe that taken as a whole it is sufficient to provide the basis for the jury to reasonably infer that the appellant, in a cool and deliberate state of mind, shot and killed Sanborn.

■■ Appellant cites *State v. Franco*, 544 S.W.2d 533, 534 (Mo. banc 1976), where the court stated "when the state's case rests upon circumstantial evidence, the facts and circumstances must be consistent with each other and the hypothesis of defendant's guilt, and they must be inconsistent with his innocence and exclude every reasonable hypothesis of his innocence." Appellant argues that the laceration found on the right side of Sanborn's head, the bullet fragments in the ceiling and in the wall near the floor are consistent with a struggle and concludes that deliberation cannot be established under the rule set forth in *Franco*. The court in *Franco* went on to limit the above cited quotation by explaining that "the prevailing circumstantial evidence rule is realistically tempered in its application since in a case involving circumstantial evidence the circumstances need not be absolutely conclusive of guilt, and they need not demonstrate impossibility of innocence, ... The mere existence of other possible hypothesis is not enough to remove the case from the jury." At 534–535. The laceration on the head, the bullet fragments in the ceiling and wall may indicate another possible hypothesis but are not inconsistent with appellant's deliberation. The evidence does not indicate that Sanborn was aggressive or that appellant was in a heated state of mind, but clearly shows the appellant to be calm and rational. The head laceration was consistent with hitting the floor. If a struggle took place, it may have been a struggle for life, which would not be inconsistent. *State v. LaRette*, 648 S.W.2d 96, 102 (Mo. banc 1983). The facts and their reasonable inferences are clearly inconsistent with innocence.

Appellant's first point is that the trial court erred in not granting a new trial where one of the jurors on voir dire failed to respond to a question asking whether anyone on the panel had a close relative who had been a victim of a crime. After the trial it was revealed that juror number nine, Bernice Anderson, had a half-brother who had been murdered approximately six weeks prior to the trial.

■■■ It is well established that every citizen has a constitutional right to a fair and impartial trial. *Goodman v. Firmin Desloge Hosp.*, 540 S.W.2d 907 (Mo.1976). Prospective jurors have a duty to answer all questions during voir dire fairly and truthfully and a failure to do so prevents a party from challenging for cause and from exercising his number of peremptory challenges. *Beggs v. Universal C.I.T. Credit Corp.*, 387 S.W.2d 499 (Mo. banc 1965). In the present case, Anderson failed to respond to the question of whether a close relative had been a victim of a crime. Although it was later revealed that she had a half-brother who had been murdered approximately six weeks prior to trial, it does not necessarily follow that appellant was not afforded a fair and impartial trial. It is not every failure of a prospective juror to respond to a voir dire question that will entitle a defendant to a new trial. *State v. McGinnis*, 622 S.W.2d 416, 417[10, 11] (Mo. App.1981).

■■ Section 494.050 RSMo 1978 provides, "no exception to a juror on account of his citizenship, nonresidence, state or age or other legal disability shall be allowed after the jury is sworn." However, an exception is recognized where: (1) the ground for disqualification was actually explored on voir dire, *State v. Robinson*, 484 S.W.2d 186[7] (Mo.1972); (2) complaining counsel had no knowledge of juror's deception, *State v. Kirkpatrick*, 428 S.W.2d 513, 517[4] (Mo.1968); and (3) the juror intentionally conceals the truth, *State v. Hudson*, 508 S.W.2d 707, 710[6] (Mo.App.1974). If these three requisites are met, an inference of bias and prejudice will arise, thereby meriting a new trial. *State v. Coy*, 550 S.W.2d 940, 942[2, 3] (Mo.App.1977). The failure to respond, silence, is prejudicial because the appellant is deprived of an opportunity to exercise his challenges, peremptory or for cause. *Coy* at 942[2, 3].

Here, the record discloses that the ground for disqualification was actually explored on voir dire, when the prosecutor asked the panel whether anyone in your family had been the victim of a crime. Other venirepersons answered but Anderson remained silent. Further, there is no indication that defense counsel had knowledge of the murder of Anderson's half-brother. Thus, the crucial question is whether Anderson intentionally concealed this fact.

The standard for the determination of whether a failure to respond is intentional was succinctly set forth in *Anderson v. Burlington Northern Ry. Co.*, 651 S.W.2d 176, 178 (Mo.App.1983) as follows:

Where there exists no reasonable inability to comprehend the information solicited by the question asked of the prospective juror, and where it developes that the prospective juror actually remembers the experience or that it was of such significance that his purported forgetfulness is unreasonable, failure to disclose is held to be intentional. At 178.

In *Anderson*, a juror failed to respond to a voir dire question of whether he or any member of his family were ever involved in a personal injury suit and later it was revealed that the juror's brother had received a substantial verdict in a personal injury suit about five years before. In reversing, this court relied on the fact that the juror admitted that when he heard the question it brought to mind his brother's accidental injury and the lawsuit which ensued.

In the present case during post trial proceedings, juror Anderson testified that she remembered the question but she never thought about the murder of her half-brother at the time the question was asked. That she and her half-brother had a common father but different mothers and she was twenty-nine years old and her half-

brother about thirty-four years old. She had never seen nor met her half-brother until she viewed him at the funeral home and later at the church and had not seen her father very often. She remembered seeing him when she was seven years of age and then not anymore until she was eighteen. Further, she testified that she had been disowned and her birth was secret. Her half-brother did not know about her nor she about him. Her father called her and told her of her half-brother's death and wanted her to attend the funeral, because he did not want his son buried without her seeing him and to make it publicly known that they were brother and sister. Further, that the first time she thought about her half-brother's murder was after she had been selected as a juror and trial proceedings were to begin.

The state argues that the death of her half-brother is not a significant event and therefore, it was reasonable that juror Anderson would not remember it. We disagree. Juror Anderson attended a funeral of a half-brother she never knew or seen in response to a call from her father, whom she did not see very often. The purpose of the father's call was for her to attend the funeral to see a half-brother she never knew she had and to publicly show that she was the sister of her father's son. The uniqueness of these circumstances makes the event, the death of her half-brother almost unforgetable in a six week period.

In *State v. Coy,* 550 S.W.2d 940 (Mo.App. 1977), defendant successfully appealed a conviction of felonious assault with intent to kill where a question was asked during voir dire concerning whether any member of the venire panel was a close friend, neighbor or had a business relationship with the sheriff who was to testify at trial. It was later revealed that a juror who had failed to respond to this question towed and impounded automobiles for the sheriff on a regular basis. It was also brought out that this juror had been called by the sheriff the night of the alleged crime for the purpose of towing defendant's vehicle. The court concluded that the juror "simply had to know" what defense counsel was asking.

We conclude that the trial judge abused his discretion in failing to find that it was unreasonable for juror Anderson not to have remembered the event. There was no reason for juror Anderson not to understand the question asked. The responses to the question by her fellow venirepersons demonstrate that. The significance of the event makes her purported forgetfulness unreasonable. The event she forgot is still unique and significant in our society. Her half-brother was murdered. The murder took place six weeks prior to this trial. She remembered the murder within a few days of the question. *See Coy* at 942, 943[4].

Where an error occurs in the jury selection procedure, we are compelled to correct the error. The jury is the cornerstone of our democratic system of justice. Each defendant is guaranteed a fair trial by an impartial jury. Here, Anderson's forgetfulness was clearly unreasonable and prevented the attorneys and the court from exploring bias and prejudice.

Judgment reversed and remanded.

STEPHAN, C.J., and SATZ, J., concur.