STATE of Missouri, Respondent,

v.

Larry A. MOUTRAY, Appellant.

No. WD 37826.

Missouri Court of Appeals,
Western District.

Feb. 24, 1987.

Motion for Rehearing and/or Transfer to
Supreme Court Denied March 31, 1987.

Application to Transfer Denied
May 19, 1987.

Robert G. Duncan, Kansas City, for appellant.

William L. Webster, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for respondent.

Before PRITCHARD, P.J., and MANFORD and KENNEDY, JJ.

MANFORD, Judge.

This is a direct appeal from a jury conviction for murder, second degree, in violation of § 565.021.1, RSMo Supp. 1984. The judgment is affirmed.

Appellant presents four points which, in summary, charge that the trial court erred (1) in failing to grant a new trial because appellant was denied a fair trial by an impartial jury; (2) in admitting, over objection, evidence of a prior statement of a state witness; (3) in the submission of an instruction on self-defense; and (4) in allowing certain comments, over objection, by the prosecution in final argument.

Appellant makes no challenge to the sufficiency of the evidence, and indeed such a challenge, had it been made, would have been without merit. Thus, a brief summary of the pertinent facts suffices.

At about 1:00 p.m. on January 20, 1985, appellant and his wife left their residence to attend a Super Bowl party at a friend's home. Cherisse [1] Moutray, their daughter, and her two-year-old son lived with appellant and his wife. The daughter and grandson remained home, and upon the departure of appellant and his wife, the daughter telephoned her former husband (the victim) and advised him that he could come over and visit their son. The former husband, Marvin Gourdine, did come to appellant's residence. The daughter, the

1. The spelling of the name Cherisse varies in the court record and is also spelled Charisse. This court has chosen the spelling, Cherisse, and in order to be consistent will use this version throughout the opinion.

grandchild, and the former husband went to get something to eat and to rent a movie. The three later returned to view the movie. The evening passed and these three fell asleep in the living room. Appellant and his wife returned home some time around midnight. Their arrival awakened the daughter and the victim. The daughter testified that her mother opened the door and appellant pushed past her mother as he entered the room, thus pushing her mother into the T.V. Appellant and the victim began to fight. (The evidence revealed a history of the victim's having beaten the daughter (his ex-wife) and his son. This had produced several past arguments and fights between appellant and the victim.) The daughter, without success, attempted to break up the fight. She proceeded to the next-door neighbor's to call the police, but the neighbor was not home. Upon her return home, she saw the victim standing in appellant's front yard. The victim's automobile engine was running. The victim yelled to her to get their son, change her clothes, and leave with him. While the daughter was at the neighbor's house, the fight between appellant and the victim had continued inside the house. This fight ended when the victim left the inside of appellant's house. After seeing the victim outside, the daughter re-entered appellant's house. She observed appellant coming down the inside hallway with a shotgun. She tried to stop appellant, struggled with appellant, (during which her nightgown was torn) but appellant ordered her out of the way or he would "hurt her." The daughter got out of the way and appellant went outside. The daughter then locked the front door. The daughter called the police. She told the police, "My dad has a gun after us, 2608 Glenn Street." A neighbor later testified that she heard someone say, "No, don't do it", and then heard a shot. She proceeded to her front window and observed a person stooped over a body. This person then stood up, threw a shotgun across the road, and then began to run toward appellant's house. The neighbor also called the police.

Two St. Joseph, Missouri police officers arrived at appellant's residence. One of the officers pulled his patrol vehicle behind the victim's vehicle. This officer found the victim. The officer attempted to determine if the victim was alive and concluded he was dead. The officer then looked around and observed appellant at his front door. The officer yelled at appellant, telling him to stop. Appellant turned around, looked at the officers, and then entered his residence through a garage door. The officers entered the residence and placed appellant in custody.

Medical evidence revealed that the victim had been fatally shot twice with a .12 gauge shotgun. Medical evidence also concluded that either wound could have been fatal.

Appellant testified on his own behalf. He stated that he and his wife had been to a party and returned home. Upon arriving, they had observed the victim's automobile in their driveway. They found the front door hard to open, and, according to appellant, he thought the victim was holding the front door closed. He stated that he helped his wife push the door open and as they entered, the victim began to beat him. Appellant stated that the fight continued down an inside hallway, and that the victim threatened to kill him. He further stated that he tore a necklace from the victim's neck and at that point, the victim made his threat and left the inside of appellant's residence. Appellant stated that he had known the victim to possess guns, so he went to the bedroom and retrieved the shotgun. Appellant stated that he looked outside and saw the victim backing out of his driveway, but the victim's automobile turned the wrong way to proceed up the road. The road is a dead end just beyond appellant's residence. Appellant stated that he just wanted the victim to leave. Appellant further stated that he proceeded to the road with the shotgun. He got in front of the victim's automobile. Appellant testified that the victim did not attempt to run him over with his automobile. Appellant stated that it was he who had shouted, "No, don't do it," and that was a statement to the victim for the victim not to get out of his automobile. Appellant stated that

the victim got out of his automobile and rushed at appellant. Appellant testified that he thought the victim had a handgun, not because he saw any weapon, but only because he knew the victim owned weapons. (No weapons were ever found on the person of the victim or his automobile.) Appellant stated that as the victim came at him, he shot the victim. At this point, according to appellant, the victim fell into or onto appellant and the shotgun (a .12 gauge pump) discharged a second time. According to appellant, he and the victim fell to the ground with the latter on top. Appellant stated that he tried to get the victim up, became scared, and threw the shotgun into the road. Appellant stated that he never saw or heard the police when they arrived. Appellant also called several witnesses, who testified as to the general reputation of the victim, who was known to have a rash, turbulent, and violent behavior. Other witnesses were called, and they testified as to the general reputation of appellant as a peaceful and non-violent person. The evidence closed. The jury returned its verdict. Judgment and sentence were entered.

A motion for new trial was filed. A hearing was held on this motion, during which a juror was called. This juror, Anthony Majeski, was asked if he recalled being asked during voir dire if he or any members of his family had ever been the victim of a crime. This question was asked of the panel, and this particular juror did not respond. At the hearing, this juror admitted that he remembered the question. He also was asked if his daughter had been the victim of a criminal act in 1978, and the juror answered, "Yes." This juror was then asked and responded as follows:

Q. Bearing in mind the background that we've just discussed about your daughter, was there any reason why you made no response to the questions that I've outlined to you before?

A. Well, I really forgot about it. I didn't remember it.

Cross-examination of this juror established no intentional concealment of the information.

This appeal followed the overruling of post-trial motions. Any further facts pertinent herein are set forth in the disposition of this appeal *infra*.

Appellant's argument in support of his point (1) asserts that the trial court abused its discretion in not granting a new trial because he was denied a fair trial by an impartial jury upon the failure of juror Majeski to disclose that his daughter had been the victim of a crime.

The evidence adduced at the hearing on the motion for new trial revealed that the criminal act committed upon the juror's daughter was a criminal battery, for which her assailant had been punished by a $1,000 fine. The offense occurred some seven or eight years prior to the trial of the instant case. As noted above, there was no evidence of intentional concealment. The only evidence as to why disclosure was not made by the juror was that he had forgotten the matter.

█ Whether this juror had forgotten the criminal act upon his daughter some seven or eight years previously presented a fact question for the trial court. It is obvious that the trial court believed the juror had forgotten about the matter. There is nothing upon this record to even suggest, let alone establish, anything to the contrary. The trial court's decision to believe the juror provided a logical basis for the court's decision. It is noted that in *State v. Endres*, 698 S.W.2d 591 (Mo.App. 1985), relied upon by appellant, the crime not disclosed by the venireman had occurred six weeks before, and was a homicide, a crime of equal gravity with the crime of which the defendant therein was charged. Such is not the case in the present action. Therefore, there is nothing to warrant this court's disturbance of the trial court's determination and decision. *Stuart v. State Farm Mutual Auto Insurance Co.*, 699 S.W.2d 450, 456 (Mo.App. 1985).

It should be pointed out that the question propounded to this juror was a general question to the entire panel. Our courts have held that in determining bias or prejudice of jurors, the whole of the voir dire

must be considered and not any one isolated response or failure to respond. *State v. Gilmore*, 681 S.W.2d 934, 944 (Mo. banc 1984). The record of the voir dire herein revealed that this juror did respond and was involved in other aspects of the voir dire, and there is nothing upon this record to disclose this juror could not or would not follow the evidence and the court's instructions upon the law.

Appellant has failed to establish any bias by this juror. The trial court did not abuse its discretion or commit any other error in its refusal to grant appellant a new trial upon appellant's allegation of having not been tried by an impartial jury. Appellant's point (1) is ruled against appellant.

Under his point (2), appellant alleges that the trial court committed error by admitting into evidence, over objection, a prior statement of a state's witness, Cherisse Moutray (appellant's daughter). Appellant also asserts that the statement, previous to its admission, had been improperly used to impeach the witness's testimony. Appellant further contends that the trial court committed plain error by allowing the prosecution to use the impeaching evidence as substantive evidence in closing argument and by allowing the statement to go as an exhibit to the jury deliberation room.

This particular point involves direct reference to a portion of the record wherein appellant's daughter testified, and the same is set forth below:

Q. So, are you saying your dad didn't push your mom into the TV set?

A. Well, I don't really remember because I was, you know, just kind of waking up.

Q. Do you recall telling the police—giving a statement to the police back on January 21, 1985?

A. Do I remember—Yeah, but I was all shooken up. I don't remember saying too much on it.

Q. Well, do you recall telling the police officer— ·

MR. RANDOLPH [attorney for appellant]: Just a minute. Your Honor, we object to this. May we approach the bench?

THE COURT: Yes.

(Counsel approached the bench and the following proceedings were had:)

MR. ROBB: Your Honor, I'm surprised by this testimony. I've got a statement from her which—and I'll read it in effect: "Statement of Cherisse Moutray. Marvin opened the door, and dad pushed mom through the door into the TV. Dad was drunk and he started swinging at Marvin."

And I feel I'm surprised by that testimony. I would like to cross-examine this witness.

MR. RANDOLPH: Well, she certainly didn't testify to that at the preliminary hearing.

THE COURT: Well, I don't know about that. If he has an inconsistent statement, he—and he's surprised, he can—

MR. RANDOLPH: Well, he can lay a proper foundation for it. I object—

THE COURT: For the statement?

MR. RANDOLPH: Yes.

THE COURT: Okay. Sustained.

(Proceedings returned to open court.)

BY MR. ROBB: [Assistant Prosecuting Attorney]

Q. You do you [sic] recall giving the statement to the police; is that correct?

A. I didn't really say anything on the statement. I could—I was so shook up. And, you know, they wanted it right then and there. And I told them I really didn't want to talk to them. They said, "Well, how about if we ask you questions and then, you know, you can yes or no on what you recall." But I didn't really, you know, give them any word specifics. I was saying yes and no. And they were doing the questioning. You know, they were asking me the questions.

Q. They were asking you yes and no about somebody pushing somebody into the TV set, and they weren't even there to know any of that?

A. Yeah. They—No, they just—They, like, they'd ask me certain questions, like on the TV set. I couldn't even really remember.

Q. All right. Well, let me show you—

A. He was probably pushing. You know, they were probably getting out of the way because Marvin was coming towards my dad, and dad was coming towards him. So, yeah, you know, probably to get mom out of the way.

Q. So, you're not denying that your dad could have pushed your mom into the TV set now; is that correct?

A. He could have, yeah.

Q. All right.

A. I didn't—

Q. I'm going to show you what's marked at the bottom as State's Exhibit No. 22—

A. Okay.

Q. —and ask you [sic] look that over, a two-page document, and tell me whether or not you can identify it?

A. Read both pages? Read both pages—

Q. Well, why don't you read it over.

A. —or just the first—Okay.

Q. All right. Now, after reading the statement, in particular, about the first page references when they came home—

A. Uh-huh.

Q. —refresh your memory as to what happened when your dad opened the door, or when Marvin opened the door?

A. Re—

Q. Did it refresh your memory as to what happened?

A. Not really because I don't really remember. It was just all kind of hectic.

Q. You don't remember whether or not— You don't remember whether or not your dad pushed your mom into the TV set?

A. Not honestly, I don't really remember.

Q. And reading that statement doesn't refresh your memory?

A. Not really.

Q. Okay. That is your signature at the bottom of the statement; is that correct?

A. Yeah. I was pretty shaken up. I usually write better. Yeah, that's pretty scribbly.

Q. Okay. Ms. Moutray,—

A. Un-huh.

Q. —you deny making the statement that, "Marvin opened the door, and dad pushed mom through the door into the TV"? Do you deny ever making that statement?

A. I don't really—

Q. Now, you said you don't remember it.

A. I don't deny it, but—

Q. You deny ever saying that statement?

A. I don't deny it, no.

Q. All right. Then do you admit making that statement?

A. As I—They had asked me. I remember kind of saying that she kind of came through, you know, he—And then the police officers asked me, they said, "Could your dad have pushed?" And I said, "Well, he could have." And then, that's how it's written out there, that I said he could have. Because I honestly didn't know. Because I had, you know, they were—by the time he got up half way through the living room, you know, that's kind of when I woke up. So I kind of really just, kind of seen mom fall in through it. I really didn't see anybody pushing anybody, to be honest.

Q. Okay. So, basically, in effect, then, you're denying that you made the statement: "Marvin opened the door and dad pushed mom through the door into the TV"?

MR. RANDOLPH: I'll object. That's repetitious.

MR. ROBB: Well, I'm asking—

THE COURT: Overruled.

BY MR. ROBB:

Q. Do you deny making that statement?

A. Do I deny—Yeah, because I didn't make that statement. I didn't say—The police officer or the detective told me. You know, they had asked me that. And so, they—That's how they had wrote it—they wrote it down, you know, that—

Q. Well, you signed the bottom of the statement saying it was true; isn't that correct?

A. I signed it just—No. They told me that that—they told me that they were

going to ask me—This was not to be used in court, that one wasn't, that they were going to ask me on a—They were going to ask me again. And that would be more a—the more legal one. And this was just was just [sic] kind of get [sic] a rundown as to what, you know, so they could have— they would have to file a report that night, they said. So, you know, they said that they wasn't even going to use this, that they'd give a more official after I had time to think of exactly what happened. They said that one was not going to be used at all. They just had to get a statement, you know, that night.

You know, and I was all shook up. That was like only 40 minutes after it all happened. And I didn't know what was going on, you know. But he said, "We have to, you know, take a statement." So they were more asking me questions, you know, and putting answers into my head. I—I mean, I really—Because they said that was not to be used, that they'd ask me more formal questions the following day, after I had settled down, and everything. Because we were just a bundle of nerves.

■ It is noted from the outset that within some 40–45 minutes of the shooting of the victim, appellant's daughter gave her statement to the local police. It is obvious from the record herein that the daughter, by her trial testimony, attempted to assist the appellant, her father. This produced inconsistencies between the statement she had given the police and her trial testimony. It is also obvious from this record that the prosecution was surprised by her trial testimony. The trial court did not commit any error by allowing the prosecution to continue the examination of the daughter by use of her prior statement. Appellant asserts that the trial court erred because the daughter had not been declared a hostile witness.

It has been determined by our state supreme court that there need be no *formal* declaration of a witness as hostile. It has been declared in *State v. Byrd*, 676 S.W.2d

494, 502 (Mo. banc 1984), cert. denied, 469 U.S. 1230, 105 S.Ct. 1233, 84 L.Ed.2d 370 (1985):

> As a general rule, the state may not impeach its own witness. The rule is equally applicable to any party to a case, whether civil or criminal. A witness may be impeached as hostile, however if two requirements are met. First, the witness must, by reason of answers which are inconsistent with previous statements, surprise the party propounding the questions. Second, the answers as given must state facts which in effect make the witness a witness for the other side. (citations omitted)

The record discloses that both requirements announced in *Byrd* were met in the testimony by appellant's daughter. The trial court did not err in permitting the prosecution to impeach the testimony of appellant's daughter.

On this specific point, respondent correctly points out that our state supreme court has abolished the so-called friendly-hostile distinction as to witnesses in civil cases. *Rowe v. Farmers Insurance Co., Inc.*, 699 S.W.2d 423, 424 (Mo. banc 1985).[2] Respondent argues that the same approach should be taken in criminal proceedings and urges this court to do so.

■ This court finds respondent's argument on this point very persuasive and declares herein that the friendly-hostile distinction as to witnesses is hereby abolished in criminal cases and that impeachment by prior inconsistent statements is permissible provided that the two requirements set forth in *Byrd* are first met. This court concludes there is no sound or rational basis to distinguish between civil and criminal proceedings upon this issue. The ruling in *Rowe* and the federal rule noted herein make imminently more sense than the practice heretofore followed on this issue in criminal proceedings in our state. This court also finds that, in effect, our state supreme court in *Byrd* made such a

---

**2.** *See Federal Rules of Evidence,* 801(d)(1) which permits (in all cases) impeachment by prior

inconsistent statements.

declaration without perhaps expressly or directly saying so. Hence, this ruling is in conformity with the rule announced in *Byrd, supra.*

■ Under this same point, appellant asserts that the trial court erred in permitting the prior statement of appellant's daughter to be admitted into evidence. It has been discussed and ruled above that the trial court did not err in permitting the prosecution to impeach appellant's daughter by her prior inconsistent statement. The question of whether impeaching evidence can be introduced as substantive evidence has been laid to rest by the enactment of § 491.074, RSMo Supp. 1985.[3] This statute was in effect and applicable to the present proceeding. The enactment of this statute has thus eliminated the long-standing division of this issue reflected in our past case history.

Appellant's argument centers upon his assertion that the entire statement should not have been introduced. The record discloses that the prosecution followed the prescribed procedure in introducing the statement (i.e., the daughter was allowed to examine and review the statement, she verified her signature on it, and the prosecution formally introduced the statement into evidence). This procedure was introduced in *State v. Stein,* 79 Mo. 330, 332 (1883), and has never been questioned. In addition, contrary to appellant's assertion that the entire statement should not be introduced, the record discloses that the trial court pointed out the statement contained nothing than what the daughter had testified to, that the daughter denied making the statements in her prior statement and a proper foundation had been presented for its introduction. These requirements having been met, the statement was admissible as impeaching evidence against the daughter. *State v. Armbruster,* 641 S.W.2d 763, 767 (Mo.1982). The trial court

did not err in admitting the statement of appellant's daughter.

Lest there be any question, § 491.074, in dealing with the admissibility of evidence, is, by its nature, procedural and hence was applicable to the present proceedings. Thus, there was no error in the statement being used as substantive evidence under § 491.074. *Weaver v. Graham,* 450 U.S. 24, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981).

■ Appellant's assertion that the prosecution used the impeaching evidence (the daughter's statement) in final argument as substantive evidence is not entirely accurate. The prosecution argued that appellant's daughter had made prior inconsistent statements. The prosecution further argued that the daughter was, at trial, biased in favor of appellant and was not being entirely truthful. The foregoing notwithstanding, it is of no importance herein in view of the application of § 491.074. The trial court committed no error, plain or otherwise, in overruling appellant's objections on this issue.

Finally, under this point, appellant asserts the trial court erred in permitting the daughter's statement to go to the jury deliberation room with the jury as an exhibit. The record discloses that after the jury retired to deliberate, it requested all trial exhibits. Appellant made the following objection:

MR. RANDOLPH: I object to the aerial photograph because it's not to scale, and it's confusing and misleading. I have no objection to the diagram of the house. I think 3, 4 and 5, the shotgun shells would be prejudicial, and has no value to them. Same for the—6, the shotgun, itself; it's prejudicial. They've seen all these. There's no use have those handling them.

Let's see. 7 through—7 through 20, or 7 through 21, are just—They've seen them all; they've looked at them at least once, probably twice, when Mr. Robb

---

**3.** Section 491.074 reads as follows:

491.074. Prior inconsistent statement may be admissible in certain cases as substantive evidence.—

Notwithstanding any other provisions of law to the contrary, a prior inconsistent statement of any witness testifying in the trial of an offense under chapter 565, 566 or 568, RSMo, shall be received as substantive evidence, and the party offering the prior inconsistent statement may argue the truth of such statement.

was showing them to them personally. And I think most of them are gruesome and they're not—wouldn't be of any value. They'd be prejudicial to just keep looking at those.

As far as the rest of the exhibits, what, I think, are the clothing, they're certainly prejudicial, and they'd be of no value to determine any relevant issue in the case.

I guess that's about all I can say.

THE COURT: Okay. Thank you. Your objections are overruled. Exhibits 1 through 28 will be passed into the jury room.

■ The now-challenged statement of the daughter was labeled Exhibit 22. No objection was made to Exhibit 22 and the trial court overruled appellant's general objection to the exhibits. This ruling was proper as being within the discretion of the trial court. *State v. Brooks,* 675 S.W.2d 53, 57 (Mo.App.1984); *State v. Diercks,* 674 S.W.2d 72, 79 (Mo.App.1984).

There was no error, plain or otherwise, by the trial court in permitting the impeachment of the daughter by her prior inconsistent statement, or by the admission of the statement into evidence, or the overruling of appellant's objections to the use thereof in the final argument by the prosecution, or by permitting the jury to view the statement during its deliberation. Appellant's point two is ruled against appellant.

In presenting his point (3), appellant alleges the trial court erred in its submission of an instruction on self-defense because said instruction required a finding that appellant was not the initial aggressor. Appellant further alleges the trial court erred in not submitting his proferred self-defense instruction because there was no evidence that appellant was the initial aggressor.

The two instructions read as follows:

## INSTRUCTION NO. 8

One of the issues in this case is whether the use of physical force against Marvin Gourdine was justifiable. The use of physical force including the use of deadly force is justifiable if used in lawful self-defense. On that issue you are instructed as follows:

1. The State has the burden of proving beyond a reasonable doubt that the defendant did not act in lawful self-defense. If the evidence in this case leaves in your mind a reasonable doubt as to whether the defendant acted in lawful self-defense in using physical force against Marvin Gourdine, you must find the defendant not guilty.

2. If the defendant was not the initial aggressor in the encounter with Marvin Gourdine and if the defendant reasonably believed it was necessary to use deadly force to protect himself from what he reasonably believed to be the imminent use of unlawful force putting himself in an imminent danger of death or serious physical injury at the hands of Marvin Gourdine, then the defendant acted in lawful self-defense and must be acquitted.

3. In determining whether or not the defendant acted in lawful self-defense you should consider all of the evidence in the case.

If Marvin Gourdine prior to the encounter made threats which were known by or communicated to the defendant, you may consider such threats as explaining the conduct or apprehensions of the defendant at the time of the encounter and for the further purpose of determining who was the aggressor.

If Marvin Gourdine Prior to the encounter made threats which were not known by or communicated to the defendant, you may consider such threats for the purpose of explaining the conduct, demeanor and attitude of Marvin Gourdine.

If Marvin Gourdine had a reputation for a rash, violent or turbulent disposition or character ordinarily or when under the influence of liquor, and if the defendant knew of that reputation, you may consider such reputation and defendant's knowledge thereof in deciding whether defendant reasonably believed he was in danger of being attacked by Marvin Gourdine and in danger of death

or serious physical injury at the hands of Marvin Gourdine.

If Marvin Gourdine prior to the encounter assaulted or directed any specific acts of violence against the defendant, you may consider them as explaining the conduct or apprehension of the defendant at the time of the encounter and for the further purpose of determining who was the aggressor.

4. If the defendant reasonably believed it was necessary to use the amount of physical force he used in order to protect himself from Marvin Gourdine, it is of no consequence that the appearances turned out to be false. If the defendant acted in lawful self-defense, as submitted in this instruction, he must be acquitted even though there was no purpose on the part of Marvin Gourdine to harm him and no purpose on the part of Marvin Gourdine to kill or seriously injure him and no immediate danger to him and no actual necessity to use such physical force as he used.

## INSTRUCTION NO. A

One of the issues in this case is whether the use of physical force against Marvin Gourdine was justifiable. The use of physical force including the use of deadly force is justifiable if used in lawful self-defense. On that issue you are instructed as follows:

1. The state has the burden of proving beyond a reasonable doubt that the defendant did not act in lawful self-defense. If the evidence in this case leaves in your mind a reasonable doubt as to whether the defendant acted in lawful self-defense in using physical force against Marvin Gourdine, you must find the defendant not guilty.

2. If the defendant reasonably believed it was necessary to use deadly force to protect himself against what he reasonably believed to be the imminent use of unlawful force putting himself in an imminent danger of serious physical injury, then the defendant acted in lawful self-defense and must be acquitted.

3. In determining whether or not the defendant acted in lawful self-defense you should consider all of the evidence in the case.

If Marvin Gourdine prior to the encounter made threats which were known by or communicated to the defendant, you may consider such threats as explaining the conduct or apprehensions of the defendant at the time of the encounter and for the further purpose of determining who was the aggressor.

If Marvin Gourdine had a reputation for a rash, violent or turbulent disposition or character, and if the defendant knew of that reputation, you may consider such reputation and defendant's knowledge thereof in deciding whether defendant reasonably believed he was in danger of being attacked by Marvin Gourdine and serious physical injury at the hands of Marvin Gourdine.

If Marvin Gourdine prior to the encounter assaulted.or directed any specific acts of violence against the defendant, you may consider them as explaining the conduct or apprehension of the defendant at the time of the encounter and for the further purpose of determining who was the aggressor.

4. If the defendant reasonably believed it was necessary to use the amount of physical force he used in order to protect himself from Marvin Gourdine, it is of no consequence that the appearances turned out to be false. If the defendant acted in lawful self-defense, as submitted in this instruction, he must be acquitted even though there was no purpose on the part of Marvin Gourdine to harm him and no actual necessity to use such physical force as he used.

A comparison of the above instructions reveals that the only difference of any pertinence herein, is in the following language found in paragraph 2 of the submitted instruction: "2. If the defendant was not the initial aggressor in the encounter with Marvin Gourdine ..."

It is noted that the parties do not disagree that both instructions came from MAI–CR2d 2.41.1.

Appellant's attack upon the submitted instruction, and hence his argument that the trial court erred in its submission of the instruction, rests upon his allegation there was no evidence that appellant was the initial aggressor. Appellant's assertion flies in the face of the record.

The record discloses that although on prior occasions appellant and the victim had argued and fought, appellant had called for police assistance. Appellant did testify that on prior occasions, the police had been called, but appellant claimed it had done no good. The evidence reveals that two weeks prior to the shooting, the victim had been at appellant's house and no problems arose.

Appellant's daughter testified that appellant might have pushed her mother into the TV to get at the victim at the outset of the altercation. The daughter further testified that she struggled with appellant, who had the shotgun, and while appellant was pursuing the victim who had already gone outside.

A neighbor overheard someone state, "No, don't do it." This neighbor also observed someone stooping over a body, throw the shotgun into the grounds, and run toward appellant's residence.

The evidence revealed that after the initial altercation, the victim left appellant's residence, went outside, attempted to persuade his former wife (appellant's daughter) to leave with him, and then got into his automobile and backed out of appellant's driveway. The evidence also revealed that at this point, appellant was outside with the shotgun at his side. Appellant approached the victim's automobile and stood in front of the automobile. There was no evidence that the victim attempted to run over appellant. Appellant stood in front of the victim's automobile with the shotgun pointed at the victim.

The evidence regarding the altercation inside the residence is controverted. The victim left appellant's residence, and it is unquestioned that appellant became the aggressor by pursuing the victim and confronting the victim with a shotgun as the victim was seated in his automobile. When the victim left appellant's residence, any real or apparent danger to appellant ceased.

Appellant is correct that Notes On Use (# 5) to MAI–CR2d 2.41.1 states that "If there is no evidence indicating the Defendant was the initial aggressor or provoked the incident, then the phrase ..." should not be used. The record herein, however, does contain evidence of appellant as the initial aggressor or the party who provoked the incident to warrant the inclusion of the phrase. There was no error in the submission of the instruction and no error in the refusal of appellant's proffered instruction by the trial court. Appellant's point three is ruled against him.

Appellant's final point (4) alleges the trial court erred and abused its discretion in allowing the prosecution to argue, over objection, that appellant was a liar as the same was an "improper epithet." Appellant sought a mistrial.

This issue requires a reference to a portion of the transcript, which reads:

She said he always carried a gun. The police searched that car; they searched his body. Not one weapon was found, not a gun, not a knife, not anything. She's a liar. She lied. And I think it's easy to see where her bias is in this case, along with the Defendant.

He lied when he says that always a gun—carrying a gun.

MR. RANDOLPH: Your Honor, that's out of line to characterize—

MR. ROBB: It's clear that—

MR. RANDOLPH: —what the Defendant has said—May I approach the bench?

THE COURT: Yes.

(Counsel approached the bench and the following proceedings were had:)

MR. RANDOLPH: That is highly improper to point a finger at the Defendant and call him a liar. His testimony is worth just as much credibility as anybody else—

MR. ROBB: It's closing argument.

MR. RANDOLPH: He has not been impeached. And to say that the Defendant

is a liar is prejudicial. And I ask for you to declare a mistrial.

THE COURT: Your request is denied. And your objection is overruled.

Appellant's argument in support of this alleged error is that his testimony was "unimpeached and corroborated in many parts." Appellant relies upon the ruling in *State v. Logan*, 617 S.W.2d 433, 435 (Mo. App.1981) which condemns the use of the term or epithet "liar" when it does not in the least aid the state's case. While *Logan* speaks to the use of such terms, this court finds it does not control the present case.

Appellant testified on his own behalf. While he gave his account of events, his testimony also contained discrepancies. Appellant's credibility was in issue. *State v. Wren*, 643 S.W.2d 800, 802 (Mo.1983). It is clear from a reading of the record that the prosecution was pointing out the differences between appellant's testimony and the testimony of his daughter relative to physical evidence and other testimony. While our courts have held that the use of name-calling and epithets is "ill advised", they do not in every instance constitute prejudicial error justifying the granting of a mistrial. *State v. Hawkins*, 690 S.W.2d 198, 201 (Mo.App.1985). *See also State v. Heinz*, 607 S.W.2d 873, 878 (Mo.App.1980).

In addition, the rule is that final argument is within the discretion of the trial court and absent a clear abuse of that discretion, a denial of a mistrial will not be overturned on appeal. *State v. Bohlen*, 690 S.W.2d 174, 177 (Mo.App.1985); *State v. Hannah*, 691 S.W.2d 345, 349 (Mo.App. 1985). Appellant has failed to establish that the trial court abused its discretion. Appellant's final point (4) is ruled against him.

Judgment affirmed.

All concur.