**STATE of Missouri,
Plaintiff–Respondent,**

v.

**Joseph L. DAYRINGER,
Defendant–Appellant.**

**No. 15294.**

Missouri Court of Appeals,
Southern District,
Division One.

July 26, 1988.

William L. Webster, Atty. Gen., Deborah L. Ground, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

Melinda K. Pendergraph, Columbia, for defendant-appellant.

GREENE, Presiding Judge.

Joseph L. Dayringer was charged by information with the class A felony of mur-

der in the first degree, § 565.020.1.[1] The information alleged that on April 10, 1986, in Jasper County, Missouri, Dayringer, after deliberation, knowingly killed Joyce Holland by stabbing her. Dayringer was 15 years old at the time of the killing, but, after a juvenile court hearing, had been certified for trial as an adult. After trial by jury, Dayringer was found guilty as charged, and was thereafter sentenced to life imprisonment without eligibility for probation or parole as punishment for the crime.

On appeal, Dayringer makes seven allegations of trial court error, including the contention that the state did not make a submissible case. We affirm.

We address the submissibility issue first, since if the state did not prove its case, reversal would be mandated, and the other allegations of error would then be irrelevant. In considering the question of whether the evidence was sufficient to submit the issue of defendant's guilt or innocence to the jury, we review the evidence and all reasonable inferences to be drawn therefrom in the light most favorable to uphold the jury verdict. *State v. McDonald*, 661 S.W.2d 497, 500 (Mo. banc 1983), cert. denied 471 U.S. 1009, 105 S.Ct. 1875, 85 L.Ed.2d 16 (1985). In cases like this where the conviction is premised on circumstantial evidence, the facts relied on by the state must be consistent with each other, consistent with defendant's guilt, and inconsistent with any reasonable theory of his innocence. *State v. Richardson*, 719 S.W.2d 884, 886 (Mo.App.1986).

The facts in the case relevant to the submissibility issue are that on the 10th day of April, 1986, Joyce Holland, a computer programmer with Tamko Asphalt Products, lived in an upstairs apartment at 114½ Pearl Street, Joplin, Missouri. The downstairs apartment was occupied by defendant Joe Dayringer his mother, Juanita Beck, Delores Andrews, Russel Burkhart, and Junior Randall, a/k/a Morris Hudnall.

On the afternoon of April 11, a fellow co-worker of Holland's, Lloyd Parker, became concerned because Joyce had not reported for work that day, nor had she called in. He went to Joyce's home and found her dead, lying on her kitchen floor. Holland had bled to death as a result of 39 stab wounds. There was dried blood on the kitchen flooring, the refrigerator, the kitchen counter, and the walls. There were three bloody footprints on the floor close to Joyce's body, showing a tread mark from a shoe sole. From the degree of rigor mortis in the body, medical experts were able to determine that the approximate time of death was 8:30 p.m. on the previous evening.

Police were called, and came to the crime scene. While interviewing people standing outside the apartment, Detective Kenneth Copeland noticed that Dayringer had several deep scratch or claw marks on his face and neck. When asked where he got the marks, Dayringer told Copeland that while pumping his pellet gun, it kicked back and struck him in the face. Copeland did not believe this story as, in his opinion, the type of accident Dayringer described could not cause the type of marks Dayringer had on his face. Copeland asked Dayringer to let him see the bottoms of his tennis shoes. When Copeland looked at the tread on the soles, it appeared to him to match the tread marks in the bloody footprints found near Holland's body. Copeland also saw what he thought to be dried blood on the tennis shoes. The shoes were confiscated by the police, and later examined by experts. The tread mark on the shoes matched the tread marks in the bloody footprints, and the bloodstains on the shoes were of type O positive blood, which was the same blood-type as Joyce Holland's. Dayringer's blood-type was A positive.

On the evening of April 10, "just before dark," Delores Andrews, Juanita Beck, Russel Burkhart, and Junior Randall left the apartment with a man by the name of Dickie Weir, in order to look for an apartment for Weir. As they left, Delores no-

---

**1.** Unless otherwise indicated, all references to statutes are to RSMo 1986, V.A.M.S., and all references to rules are to Missouri Rules of Court, V.A.M.R.

ticed that Dayringer was talking to Joyce, who was painting a fence for a cat pen. Dayringer was wearing a camouflage jacket and blue jeans. When the group returned three or four hours later, absent Weir who had gone home, Dayringer was asleep in his room. There was a pair of blue jeans and a shirt soaking in the bath tub, which had not been there earlier.

The next morning, Delores saw scratches on Dayringer's face, and teased him about it saying, "it looked like a wildcat got ahold of him." She had not noticed the scratches on his face before. Dayringer told Delores his gun had backfired on him. Several days later, after Dayringer had been placed in custody, Delores went into his room to pack his clothes and clean up the room, as the group had decided to move. Delores found a bloody camouflage jacket that looked like Dayringer's, and a bloody pair of blue jeans hidden behind a couch. She showed the articles to Junior Randall and Juanita Beck. Juanita, who was Dayringer's mother, started crying. Delores did not know what Juanita did with the clothes. Later, Delores saw Juanita washing some "black stuff" off a survival knife that belonged to Dayringer. The bloody jacket, jeans, and knife were never located by the police.

Dayringer told three different stories as to how he got the scratches on his face and neck. He said he received them from (1) a pellet gun malfunction, (2) by cutting himself shaving, and (3) in a bicycle wreck. Witnesses in his behalf at trial added a fourth explanation which was that Dayringer received them while playing war games. At trial, Dayringer admitted being alone in the downstairs apartment for some time on the evening of Joyce Holland's murder. No one saw her alive after that time. The evidence related above was consistent with Dayringer's guilt, and inconsistent with any reasonable theory of his innocence, and was sufficient to let the jury reasonably infer that Dayringer killed Joyce Holland. The point is denied.

■ The next three allegations of trial court error that we address, which were Dayringer's points relied on one, two, and three, concern proposed defense witness Kenneth Heistand. In April of 1987, Heistand, who was serving time in the Missouri Department of Corrections, wrote the Jasper County Public Defender and told him that while he and Russel Burkhart were both confined in the Carthage, Missouri jail, Burkhart, who was described by Heistand as a "state witness," told Heistand that he (Burkhart), and not a "juvenal," [sic] had murdered a young woman in Joplin by stabbing her. The public defender disclosed this information to the prosecutor at whose request Heistand was interviewed by Cole County authorities. In this interview, Heistand said Burkhart had told him that he had stabbed Joyce Holland a number of times during an unsuccessful rape attempt, and had hidden his bloody clothes behind a sofa in Dayringer's room. Heistand also talked to defense counsel about Burkhart's conversation with him. Heistand was then subpoenaed by the defense, and was brought to Joplin by authorities so that he might testify. After being confronted by the prosecutor who was trying Dayringer's case, and being told that he might be cross-examined relative to an unrelated murder, Heistand refused to testify on the grounds that his testimony might incriminate him. A defense motion to compel him to testify was denied by the trial court.

Dayringer contends that (1) Heistand's refusal to testify was the result of prosecutorial misconduct in that the prosecutor's threats to question Heistand about an unrelated homicide coerced him not to testify, (2) the trial court erred in failing to compel Heistand to testify, as no rational basis existed for Heistand's invocation of his privilege against self-incrimination, and (3) the trial court erred in failing to grant a new trial because the state failed to disclose to defense counsel what Heistand had told state investigators concerning his conversations with Russel Burkhart.

Heistand's statements regarding his alleged conversation with Burkhart, if admissible at all, would only be so as an exception to the hearsay rule called declarations against penal interest. Generally, such

declarations are not admissible in criminal proceedings, *State v. Turner*, 623 S.W.2d 4, 8 (Mo. banc 1981), and are never admissible unless (1) the declarant is unavailable as a witness, with refusal to testify by asserting fifth amendment privileges being considered proof of unavailability, (2) there is substantial indicia of reliability of the alleged declaration, and (3) the declaration, if true, would exonerate the defendant. *State v. Brooks*, 693 S.W.2d 211, 212 (Mo. App.1985); *State v. Turner*, supra, 623 S.W.2d at 9. All prongs of this test must be satisfied in order for the declaration to be allowed.

■■■ Here, there was no proof that Burkhart was unavailable as a witness. He was incarcerated in the Missouri state penitentiary, and could easily have been produced. In addition, he testified at a pretrial hearing that he was willing to testify. He was available as a witness to either the state or the defense, if they had chosen to use him. In addition, there was no corroborating testimony or other evidence of reliability to support Heistand's statement about his alleged conversation with Burkhart. As a result of failure of proof on these two required elements, Heistand's statement regarding what Burkhart supposedly told him was inadmissible hearsay. This being so, whatever Heistand said Burkhart told him was immaterial, and failure to disclose immaterial information the prosecution may have received in its interview with Heistand could not be the basis for awarding a new trial. *Hayes v. State*, 711 S.W.2d 876, 879 (Mo. banc 1986). None of the three related points relied on have any merit.

In his fourth point relied on, Dayringer contends the trial court erred in admitting into evidence (1) his tennis shoes and "derivative evidence" (blood samples) taken from the shoes, (2) his statements made after being taken into custody, and (3) the results of his blood test which was taken pursuant to court order. He contends such evidence was obtained in violation of the Juvenile Code of Missouri in that when he was placed in custody he was taken to police headquarters, rather than to juvenile court, that he was questioned and his tennis shoes were seized without the consent of a juvenile judge, and that the blood test had been taken without proper judicial authorization.

■■■ Timely motions to suppress the shoes and derivative evidence, the statements, and the results of the blood test had been filed and denied. In order to preserve for appellate review a claim regarding the admissibility of questioned evidence, a timely specific motion to suppress must be filed and, if such motion is denied, the issue must be kept alive by a timely specific objection at trial. *State v. Stidum*, 684 S.W.2d 448, 450 (Mo.App.1984); *State v. Franco*, 544 S.W.2d 533, 537 (Mo. banc 1976), cert. denied 431 U.S. 957, 97 S.Ct. 2682, 53 L.Ed.2d 275.

■ When Dayringer's tennis shoes were offered in evidence, defense counsel said he had no objection. There was no objection made to testimony of the state's expert witness that he found human blood on Dayringer's tennis shoes but that there was not enough for him to determine the blood-type. There was no objection made to the testimony of an expert witness for the state that Dayringer had A positive type blood, and no specific objection to the testimony of Officer Copeland concerning a conversation he and Dayringer had after the defendant had been taken into custody. The only thing that could reasonably be called an objection raised at that time was the following statement by defense counsel: "I believe, Judge, somewhere along the line, one of the various attorneys involved in this fiasco, filed a Motion to Suppress Statements. So I guess I better renew the motion at this time." This did not amount to a timely specific objection to the introduction into evidence of Dayringer's statements to the police, the shoes, and the blood test results. The point relied on was not properly preserved for appeal.

■■■ Plain error review of the point relied on is not justified. In order to constitute reversible error, plain error must be of such magnitude that it causes a miscarriage of justice. Rule 30.20; *State v. Valentine*, 646 S.W.2d 729, 731 (Mo.1983).

Such is not the case here. When Dayringer's statement was taken by the police, his father and mother, as well as two Jasper County Juvenile Officers, were present. Before being questioned, Dayringer's constitutional rights were explained to him and his family by one of the juvenile officers, and Dayringer's mother, as well as Dayringer, signed the waiver of rights form. In addition, the only admission Dayringer made in the statement that was incriminating was that he had been alone with Joyce on the evening she died. He said virtually the same thing when he testified at trial in his own defense. In such situations, the introduction into evidence of the prior statement has been held not to be prejudicial, even though it is claimed that the initial statement was taken in violation of the defendant's constitutional rights. *State v. Brown,* 654 S.W.2d 290, 291 (Mo. App.1983).

In regard to the seizure of Dayringer's tennis shoes and their subsequent testing, § 211.061.1 provides that:

When a child is taken into custody with or without warrant for an offense, the child, together with any information concerning him and the personal property found in his possession, shall be taken immediately and directly before the juvenile court or delivered to the juvenile officer or person acting for him.

The purpose and intent of this statute is that the child be provided with the services of a juvenile officer, or person acting for him, before being subject to police interrogation or having property seized.

■ In addition to being advised of his constitutional rights and signing a waiver of those rights, a juvenile officer was present and available to Dayringer before his shoes were seized. If Dayringer had been an adult at the time of the murder, there would be no question as to the rights of law enforcement officers to seize the shoes based on the information they had at that time. We cannot see where it makes any difference that he was a juvenile. The shoes were in plain view, and it was apparent to the police officer who took Dayringer into custody that the shoes might be, and probably were, significant evidence in the Holland murder case they were investigating. The seizure was justified. *See State v. Clark,* 592 S.W.2d 709, 713–15 (Mo. banc 1979), cert. denied 449 U.S. 847, 101 S.Ct. 132, 66 L.Ed.2d 57.

■ In his remaining argument under this assignment of error, Dayringer contends that the test results of his blood-type examination should not have been admitted into evidence because Jasper County Circuit Judge L. Thomas Elliston, who issued the search warrant authorizing the blood test, was not the juvenile court judge at that time and, therefore, had no jurisdiction to enter the order in question.

Rule 34.01 relates to the issuance of search warrants and provides that the provisions of Chapter 542 RSMo shall govern procedures in searches and seizures. Section 542.271.1(1) provides that a search warrant may be issued for any material or substance "that constitutes evidence of the commission of a criminal offense." Section 542.266.2 provides that a search warrant may be issued by an appellate judge or by any judge of a court having original jurisdiction of a criminal offense within the territorial jurisdiction where the person, place, or thing to be searched is located. Judge Elliston was such a judge. Rule 124.01 provides that an application for a search warrant in connection with a juvenile court proceeding may be made to the juvenile court, but the rule does not say it has to be. In fact, the Supreme Court's comment to the rule[2] states the rule is permissive, in that the application for the warrant may, but need not, be made to the juvenile court. We find no prejudice or, for that matter, error in the procedure through which the blood sample was obtained. The point has no merit.

■ Dayringer next argues that the trial court erred in allowing Lance Simpson, a 15 year-old student at Joplin Junior High School, to testify that the tennis shoes Dayringer was wearing when arrested, and which were evidence linking Dayringer

2. V.A.M.R. (Supp.1988).

with the murder, had been stolen from Simpson in 1985, and that they had no blood on them at that time. Dayringer admits no objection was made to the admission of such testimony at trial, but contends its admission constituted plain error, as it was evidence of an unrelated crime.

Since no objection was made to Simpson's testimony at the time of trial, the point has not been preserved for appellate review. Plain error review is not justified, as Simpson's testimony that is now objected to was offered to explain why his name was in the shoes, and that neither he nor anyone else had bled on them during the time that they had been in his possession. Since the jury had seen "Lance S." written inside the shoes, his testimony clarified matters that might have caused confusion in the minds of the jury. The admission into evidence of the unobjected to testimony did not cause a manifest injustice or result in a miscarriage of justice. The point has no merit.

In his remaining point relied on, Dayringer claims the trial court erred in overruling his objection to the prosecutor's questioning of witness Delores Andrews as to w'iether she had heard that prior to the murder of Joyce Holland, Dayringer had stolen a bicycle, had attempted to grab a police officer's gun, and had threatened to kill the officer who was questioning Dayringer. The questions were asked after the witness had stated that Dayringer was "a good kid," and was "polite to all women," and were asked "to test that witness' knowledge if her opinion would be the same if she knew that, number one, that Joe had been arrested on one occasion for stealing a bicycle and in fact the bicycle was returned by his mother to the Police Department and secondly, if her opinion would be the same if she had known that Mr. Dayringer had been arrested for being intoxicated and in possession of alcohol and, in fact, on that arrest had made numerous threats to an officer, to kill that officer and to obtain a firearm."

Dayringer's motion for new trial did not contain any assignment of error on this issue. The point is not preserved

for appellate review. *State v. Gibson*, 633 S.W.2d 101, 107 (Mo.App.1982). Plain error review is not justified, as rumors of the defendant's prior misconduct may be introduced to test the credibility of the witness who is offering testimony concerning the reputation of the defendant. *State v. Burr*, 542 S.W.2d 527, 532 (Mo.App.1976). This holds true even if the defendant was a juvenile at the time of the alleged misconduct. While such misconduct, in absence of certification, could not be used to convict a juvenile of a crime, it certainly could be shown to counteract the impression that the youthful offender was "a good kid." The point has no merit.

We find no error of consequence, plain or otherwise, in any ruling or action of the trial court.

Judgment affirmed.

CROW, C.J., and HOLSTEIN, J., concur.