STATE of Missouri,
Plaintiff/Respondent,

v.

Marvin JENNINGS,
Defendant/Appellant.

Marvin JENNINGS, Movant/Appellant,

v.

STATE of Missouri,
Defendant/Respondent.

Nos. 55682, 58698.

Missouri Court of Appeals,
Eastern District,
Division Two.

July 30, 1991.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Sept. 5, 1991.

Application to Transfer Denied
Oct. 16, 1991.

Susan L. Hogan, Asst. Appellate Defender, Kansas City, for defendant/appellant, movant/appellant.

William L. Webster, Atty. Gen., John P. Pollard, Asst. Atty. Gen., Jefferson City, for plaintiff/respondent, defendant/respondent.

AHRENS, Judge.

Marvin Jennings appeals from the judgment rendered by the trial court after a jury found him guilty of five counts of murder in the first degree, two counts of assault in the first degree, one count of robbery in the first degree and eight counts of armed criminal action. The jury assessed punishment of life imprisonment

without the possibility of probation or parole on each of the murder counts. After finding appellant to be a prior offender, the trial court sentenced appellant to life imprisonment without the possibility of probation or parole on each of the five murder counts, fifteen years' imprisonment on each assault count, and life imprisonment on each of the robbery and armed criminal action counts, with all sentences to run consecutively.

Marvin Jennings also appeals the denial of his Rule 29.15 motion without an evidentiary hearing. The two appeals have been consolidated. We affirm both the trial court's judgment of conviction and the motion court's order denying post-conviction relief.

The evidence, viewed in the light most favorable to the verdict, *State v. Feltrop*, 803 S.W.2d 1, 5 (Mo. banc 1991), established that on September 4, 1987, the National Supermarket at 4331 Natural Bridge Road in the City of St. Louis was robbed shortly after closing. Several employees, including Harold Meyer, Richard Fortson, Rose Beam, Michael Marr, Mike Beam and Chris Hennicke, as well as David Spahn, a security guard, and Kenneth Bass, a cleaning crew employee, were in the store at the time. Meyer was in his office; Brown and Fortson were in the adjacent customer service office. Marr called to Meyer about leaving, and the security guard escorted Marr toward the automatic doors on the store's east side to let him out. Within a minute of their leaving, a gunman ("first gunman") entered Meyer's office, put a gun in Meyer's face and announced the holdup. The gunman ordered him to open the safe. Brown, Fortson and Beam came into Meyer's office. The gunman hit Meyer in the head and then punched Beam when initial efforts to open the safe were unsuccessful. Brown was eventually able to open the safe.

The gunman filled a National plastic bag with money from the safe. A total of $7,534.20 was stolen, including $1,500.00 to $3,000.00 in dollar bills bundled in stacks of one hundred. Ten stacks were blocked together in cellophane and wrapped to form a brick. The gunman took some bus passes and ordered the employees out of the office.

Earlier, from the office window looking into the store, Fortson had seen a man whom he first thought was a cleaning man approach the security guard, pull a gun out of his pants and wave the security guard over. This man was wearing a multicolored flannel shirt. As they left the office, Meyer saw another man with a gun in his hand, standing by a liquor display and facing the other way.

The four employees were ordered to lie down on the floor. The security officer and cleaning man were already on the floor. The first gunman ordered the employees to get up and lie down closer together with their heads next to the wall; Marr then approached and joined the others on the floor. Ten seconds later and with no exchange of words, two gunmen fired shots at the employees' heads. The first gunman was standing at Meyer's feet; the second, at another location. Five to eight shots were fired. The second gunman asked the security guard for more bullets and took them from the guard's pocket. He reloaded and went down the line, again shooting Beam, Bass, and Brown in the head. When he put the gun to Meyer's head, Meyer ducked his head out of the way just as the gunman pulled the trigger. Meyer was shot in the hand, but pretended to be dead.

Hennicke was stocking shelves with two other men in the store when he heard at least six shots. He first saw a man he thought was from the cleaning crew looking out towards the street; he then saw another man in the front of the store, leaning over several bodies on the floor. Meyer was toward the corner, with blood on his forehead. Hennicke ran back to where the other stockmen were and heard additional shots. Hennicke and another stockman crawled up on the roof and yelled for help to a woman walking down the street. From the roof, Hennicke saw the men leave the store in a car. In the meantime, Meyer had crawled to a telephone and called the police. Brown, Beam, Bass, Spahn, and

Marr died from their gunshot wounds. Meyer and Fortson survived and testified at trial.

That same night, Phillip Harden went to the home of James Blankenship, a younger brother of appellant's codefendant Donnie Blankenship. Donnie, the only one at home, showed Harden a gun, later identified as having belonged to the security guard. Donnie was drinking and acted nervous. Appellant was not present.

Two or three days later, Harden gave Donnie a ride to the house of Leroy Blankenship, Donnie's older brother. Donnie acted nervous and ducked down in his seat when they passed a police car. When Harden asked what was wrong, Donnie responded that he had committed a robbery. Three or four days later, Donnie loaned Harden fifty dollars, all in one-dollar denominations.

Sharon Lewis, the mother of appellant's child, saw appellant the morning after the murders, around nine o'clock. Appellant paid her forty or sixty dollars he had borrowed from her two days earlier.

Leroy also saw Donnie and appellant the day after the murders. Donnie, appellant's brother Myron, and appellant were planning to go to New Orleans for a relative's funeral. A few days after their return from New Orleans, Donnie and appellant went to Leroy's home. While they were watching television, a news broadcast of the National Supermarket crime was aired. Donnie stated, "We was in that." Appellant was silent, but shook his head.

Leroy testified that about a week after he had heard of the National Supermarket robbery, Donnie brought a gun and white plastic grocery bag to Leroy's home. The bag contained $1,000.00 in one-dollar bills, banded and wrapped in plastic in bundles of one hundred, and about two hundred loose one-dollar bills. Leroy testified that Donnie said he got the money from a dope house. Donnie asked Leroy to keep the gun and money for him. In his statement to police, Leroy said Donnie later told him the gun and money came from the National store.

In mid or late September, Donnie Blankenship saw his uncle Jimmy Kennedy at an auto mechanic's shop. Donnie mentioned to Kennedy that he had a gun. Donnie paid the auto mechanic fifty dollars, including forty one-dollar bills, as a deposit for some car repairs. Donnie also agreed to loan the gun to Kennedy, and told him it was at Leroy's house.

Kennedy picked up the gun at Leroy's house a few days later. Kennedy left the house with the gun and kept it for a few weeks at his home for protection. Donnie later told Kennedy he wanted the gun back, and Kennedy, planning to return the gun, put it in the trunk of his car.

On November 8, 1987, police stopped Kennedy for speeding. Kennedy could not produce satisfactory proof that he owned the car. After Kennedy consented, the police conducted an inventory search of the car and discovered the gun in the trunk. The gun was later identified as the gun taken from the security guard the night he was murdered. Kennedy first told the police he had obtained the gun off the street, but later he revealed that Donnie Blankenship had given him the gun.

On November 10, 1987, Phillip Harden heard of Kennedy's arrest on the news. Harden and James drove to the house of appellant's girlfriend, Grace Stevenson, and had a discussion with appellant about leaving town. They then went to Leroy's house, where they and Donnie Blankenship discussed getting Donnie out of town. James, Donnie and Harden drove to Burger King (where James worked) to get money James' boss had been saving for him. James was unable to retrieve the money.

Harden and Donnie again went to Stevenson's home to see appellant. James again tried to collect his wages. He had been directed to call Donnie at Stevenson's home once he had collected the money.

The police apprehended Donnie and appellant when they ran out the back door of Stevenson's home. Both men were arrested, as were Stevenson and Harden.

Sharon Lewis, James Blankenship, and Leroy Blankenship gave statements to the police that strongly implicated appellant in

the robbery-murders. At trial, however, Sharon and James recanted much of what they had told the police; Leroy also denied certain prior assertions and claimed he could not remember certain details. The prior inconsistent statements of all three were admitted at trial as substantive evidence. We relate a more detailed account of the statements in our consideration of appellant's third and fifth points.

■ Appellant's first point alleges the trial court erred in permitting the videotaped statement of James Blankenship to be replayed for the jury during its deliberations. Shortly after it had retired to deliberate, the jury asked for a number of exhibits, including the videotape. The trial court, with counsels' approval, gave the jury all the requested exhibits except the videotape. The jury again asked for the tape. Over appellant's objection, portions of the videotape played during the trial were again shown to the jury. During the taped interview, James told police that appellant had admitted participating in the National Supermarket murders.

■ The decision whether to allow exhibits to be taken to the jury room is a matter of discretion for the trial judge. *State v. Luckett*, 770 S.W.2d 399, 404 (Mo.App. 1989). To constitute an abuse of discretion, the act must be untenable and clearly against reason, and must work an injustice. *State v. Brooks*, 675 S.W.2d 53, 57 (Mo. App.1984).

Appellant contends that playing the tape unduly emphasized this evidence and impermissibly bolstered the state's case. He characterizes the tape as testimonial evidence and argues that, as such, it should not have been given to the jury. He concludes that appellant was prejudiced by the court's replaying the videotape for the jury because the tape was the only evidence directly linking appellant to the crime.

■ The videotape had been properly admitted into evidence and the jury viewed it

twice during the trial.[1] Although as a general rule exhibits which are testimonial in nature may not be given to the jury during its deliberations, an exception is made for written or recorded confessions in criminal cases. *State v. Evans*, 639 S.W.2d 792, 795 (Mo. banc 1982). This exception is apparently based on the theory that the centrality of such confessions to the case warrants giving the jury access to them during deliberations. *Id.; see also* Annot., 37 A.L.R.3d 238 (1971) and Annot., 60 A.L.R.3d 333 (1974).

In his videotaped interview, James related statements appellant made to him regarding details of the robbery-murders. He also told police during the interview that appellant admitted, "I think I killed them ... that little boy at the National store," and appellant "assumed he shot the lady." Appellant's statements to James were admissions in the nature of a confession to the crimes charged. Those admissions directly implicated appellant in the crimes and were central to the state's case. *See Evans*, 639 S.W.2d at 795.

Contrary to appellant's contention, permitting the jury to view the tape during its deliberations did not unduly emphasize the evidence or impermissibly bolster the state's case. The jury was permitted to view a number of other exhibits during its deliberations, thus diminishing any emphasis on the tape. *See State v. Hogan*, 748 S.W.2d 766, 769 (Mo.App.1988). Further, as in *Hogan*, the trial court retained control over the jury's exposure to the videotape; the jury returned to the courtroom to view the videotape, and portions of the tape were shown to the jury only once during deliberations. *See id.*

Similarly, in *State v. Moutray*, 728 S.W.2d 256 (Mo.App.1987), the prior inconsistent statement of a state's witness had been marked and admitted into evidence as an exhibit. *Id.* at 264. The court found no error, "plain or otherwise," in permitting the use of this statement by the prosecutor

---

**1.** The edited videotape was played three times during the trial: first, during the state's case-in-chief, over defense counsel's objection; second, an excerpt was replayed without objection during the state's closing argument; and, finally, excerpts were played during the jury's deliberations.

during his final argument or in permitting the jury to view the statement during its deliberations. *Id.*

Appellant relies on *State v. Seever,* 733 S.W.2d 438 (Mo. banc 1987), where our supreme court held that total repetition and broad duplication of evidence at trial is improper. *Id.* at 441. *Seever* involved bolstering testimony using prior consistent statements. *Id.* In the present case, the videotape contained prior inconsistent statements by James and were not used to bolster his trial testimony. Moreover, we have viewed the tape and note that many of the witness' statements were incomprehensible without careful review.

In light of the facts, we find no abuse of discretion in permitting the jury to view the videotape during its deliberations. Appellant's first point is denied.

Appellant's second point contends the trial court erred in allowing witnesses Phillip Harden and Leroy Blankenship to testify that appellant's codefendant Donnie Blankenship made certain statements to them, implicating appellant and himself in the National Supermarket crimes.

During the state's redirect examination, Harden testified he gave Donnie Blankenship a ride to Leroy's house a few days after the robbery-murders on September 4, 1987. Harden stated that en route, Donnie acted nervous and ducked down in his seat in the car. Defense counsel's objection on grounds of relevancy was overruled. Harden then testified Donnie told him that Donnie "had fucked up and did a robbery on some people."

Appellant did not object at trial to Harden's testimony about Donnie's statement. We review for plain error. Whether plain error exists depends on whether this court finds that a "manifest injustice" or a "miscarriage of justice" has occurred. Rule 30.20; *State v. Petary,* 781 S.W.2d 534, 540 (Mo. banc 1989), *vacated on other grounds,* — U.S. —, 110 S.Ct. 1800, 108 L.Ed.2d 931 (1990).

Defense counsel cross-examined Harden and asked him, "What else did he [Donnie Blankenship] tell you about the gun? Any-

thing?" The following colloquy then occurred:

MR. RANDALL (Prosecutor): Your Honor, I'm going to object to this unless we open up the whole topic.

THE COURT: Yeah, it's hearsay. If you want to get into hearsay, you may.

MR. RANDALL: I mean this and everything else, if he wants to get into it now—

MR. KESSLER (Defense counsel): Fine, your Honor. I will, you know, if he thinks that this opens up the door to everything that Donnie Blankenship ever said.

THE COURT: No. I think this opens the door to what Donnie Blankenship says to this witness.

MR. KESSLER: That's all right, okay.

■ The prosecutor's subsequent redirect examination elicited the testimony now alleged inadmissible. We find no error, plain or otherwise, in the admission of Donnie's statement through Harden's testimony. A defendant is in no position to complain of the state's inquiry into matters brought into the case by the defendant's own questions. *State v. Jordan,* 646 S.W.2d 747, 750 (Mo. banc 1983). Appellant opened the door for admission of the statement and acquiesced to questions concerning the statement and its surrounding circumstances; accordingly, its admission was proper.

We now consider the admissibility of Donnie's statement to Leroy. On direct examination, Leroy testified that a few days after Donnie left money and a gun with him, appellant, Donnie and Leroy were watching television at Leroy's house. During a news broadcast about the National Supermarket murders, Donnie told Leroy, "We was in that." Leroy indicated on direct examination that appellant said nothing in response to Donnie's statement. Defense counsel did not object and no claim of error concerning this testimony was raised in appellant's motion for new trial.

Therefore, appellant has preserved nothing for appellate review regarding Donnie's statement to Leroy. *State v. Cornman,* 695 S.W.2d 443, 446 (Mo. banc 1985).

(without reviewing for plain error, our supreme court denied an allegation the trial court erred in admitting a witness' testimony that appellant's coconspirator told the witness appellant shot the victim, where no objection to the testimony was raised at trial). Cognizant of the lack of preservation, appellant asserts the admission of Donnie's statement constituted plain error under Rule 30.20.

Appellant contends Donnie's statement to Leroy was inadmissible hearsay. The state asserts the "general rule is that inadmissible hearsay which goes in the record without objection may be considered by the jury." *State v. Stidum,* 684 S.W.2d 448, 450 (Mo.App.1984). The state further asserts the testimony was admissible under the coconspirator exception to the hearsay rule.

■ Generally, out-of-court statements made by a coconspirator after the termination of the conspiracy are inadmissible against the other conspirators. *State v. Clevenger,* 733 S.W.2d 782, 784 (Mo.App. 1987). However, "[i]t is well-established that out-of-court statements of a defendant's co-conspirators, made during the course of the unlawful conspiracy and in furtherance of its objects, are admissible against the defendant." *State v. Frederickson,* 739 S.W.2d 708, 711 (Mo. banc 1987).

Here, appellant's coconspirator made the statement after completion of the crimes but during a discussion with appellant and a third party who had agreed to store both the weapon used in the crimes and the money constituting the fruits of the crimes. Statements made at a time when efforts are being taken to conceal evidence and avoid exposure are properly admissible. *State v. Ronimous,* 319 S.W.2d 565, 569–70 (Mo.1959). Here, the conspiracy continued after completion of the robbery-murders and during the time Donnie's statement was made, in that the parties involved made continued efforts to conceal the weapon and to stash and divide the stolen money. The record reveals that appellant was either with Donnie or brought Donnie to Leroy's house when Donnie came to get money stolen in the robbery-murders, and that Donnie gave appellant some of the money.

■ Although there was sufficient evidence that the conspiracy continued at the time Donnie made the statement, the statement was not an effort to conceal the crimes or to defeat prosecution. *See State v. Grebing,* 787 S.W.2d 877, 880 (Mo.App. 1990). As such, there was insufficient evidence that the statement was made in furtherance of the conspiracy. *See Frederickson,* 739 S.W.2d at 711; *Clevenger,* 733 S.W.2d at 785. Accordingly, Leroy's testimony regarding Donnie's statement was not admissible under the coconspirator exception to the hearsay rule.

■ We find no plain error, however, in the admission of the challenged testimony. Appellant's resort to plain error as a basis for appellate relief placed a much greater burden on him. *State v. Hubbard,* 659 S.W.2d 551, 556 (Mo.App.1983). To obtain relief under plain error review, a "defendant must not only show that prejudicial error resulted, he must further show that the error so substantially affects his rights that manifest injustice or a miscarriage of justice will inexorably result if left uncorrected." *Id.*

Appellant has failed to show that the error substantially affected his rights. Donnie's statement, "We was in that," did not directly refer to appellant; even in light of the surrounding circumstances, the statement did not implicate appellant in the crimes. *Cf. Clevenger,* 733 S.W.2d at 783–785 (plain error resulted from admission of coconspirator's statement implicating defendant in the crimes charged where the statement was not made in furtherance of the conspiracy).

Further, appellant's conviction did not hinge on Donnie's statement to Leroy. On cross-examination and over the state's objection, Leroy testified for the first time that appellant "shook his head no" in response to Donnie's statement. On redirect examination Leroy stated, without objection, that he interpreted Donnie's statement and appellant's gesture as a joke; as

if appellant was saying, "no, he just saying that." Defense counsel fully explored both Donnie's statement and appellant's negative gesture in response to that statement. Therefore, appellant has not shown that manifest injustice resulted from the admission of Donnie's statement to Leroy. Point two is denied.

Appellant's third point predicates error in the admission as substantive evidence of the prior inconsistent statements of state witnesses Sharon Lewis and James Blankenship. In his fifth point, appellant asserts a similar claim with respect to the statements of Leroy Blankenship, as well as those of Sharon Lewis and James Blankenship; appellant also alleges error in the trial court's refusal of his proffered instructions that would have limited the jury's consideration of this evidence to its bearing on the witnesses' believability. Appellant argues that allowing the statements into evidence violated his federal and state constitutional rights to confrontation and cross-examination, and that the statements should not have been considered as substantive evidence because they were unsworn, unreliable, extrajudicial and repudiated under oath at trial. We consider the two points in tandem.

As an initial matter, we note that we are unable to conclusively determine from the record which of the witnesses' prior inconsistent statements were considered by the jury. The trial transcript notes only that portions of the witnesses' audio or videotaped statements were played; the transcript does not specify which portions were played or contain a transcription of the witnesses' taped testimony. The trial judge apparently heard argument and made rulings in chambers regarding which portions of the tape were to be shown. It appears, however, that no transcript was made of these proceedings. Further, only the full-length, unedited tapes were made a part of the record on appeal.

██ The party desiring to create a record has the obligation to do so at the time the statement or event occurred, *State v. Hoopes,* 534 S.W.2d 26, 32 (Mo. banc 1976), and to furnish that record on appeal.

Rule 30.04. Appellant has failed to create or file a record upon which we can conclusively determine which portions of the tapes were played for the jury; however, we find no reversible error even if we assume all the statements discussed herein were played.

A witness's prior inconsistent statements traditionally were admitted as evidence solely for purposes of impeachment, and juries were duly instructed of their limited use; however, the enactment in 1985 of § 491.074 RSMo 1986 displaced prior case law in criminal cases. *State v. Clark,* 756 S.W.2d 565, 568 (Mo.App.1988). Section 491.074 RSMo 1986 provides:

> Notwithstanding any other provisions of law to the contrary, a prior inconsistent statement of any witness testifying in the trial of an offense under chapter 565, 566 or 568, RSMo, shall be received as substantive evidence, and the party offering the prior inconsistent statement may argue the truth of such statement.

The constitutionality of this statute was upheld by our supreme court in *State v. Bowman,* 741 S.W.2d 10 (Mo. banc 1987), *cert. denied,* 488 U.S. 829, 109 S.Ct. 83, 102 L.Ed.2d 60 (1989). *Bowman* held that prior inconsistent statements are admissible as substantive evidence, and that the only necessary foundation is whether the witness made the statement and whether the statement is true. *Id.* at 14. The court specifically refrained from answering whether the inconsistent statements could be used as substantive evidence if the witness did not admit making the statements or declined to submit to cross-examination. *Id.* at n. 6.

██ In a criminal case, a witness' prior inconsistent extrajudicial statements may not be admitted as substantive evidence when the witness at trial denies having made the statements. *State v. Oliver,* 775 S.W.2d 308, 310 (Mo.App.1989). However, statements a witness admits having made may be admissible under § 491.074 without the declarant's admitting their truth. *State v. Belk,* 759 S.W.2d 257, 259 (Mo.App.1988). Further, it is not necessary for the declarant to himself admit he made

the statements if from his testimony and other evidence it is established that such statements were made. *Id.* Here, the testimony of the police officers and the documentary videotape evidence reliably established that such statements were made.

■ We first consider the admission as substantive evidence of the prior inconsistent statements of Sharon Lewis. In an interview on March 29, 1988, Lewis, appellant's ex-girlfriend, told the police that sometime earlier that month she had talked to appellant. During the conversation, appellant stated he was able to enter the National Supermarket on the night of the robbery-murders because he sometimes worked at the store cleaning up at night. When Lewis asked appellant if he had killed "those people," appellant made no response, but just stared.

The police taped Lewis' statement, which was admitted into evidence over defense counsel's objection. At trial, Lewis first repudiated the gist of her statement. However, Lewis later testified that she had lied because the police threatened to take away her children. Specifically, Lewis denied telling police appellant made the statement about his entering the store on the night of the robbery-murders. Lewis also denied telling police that she asked appellant whether he had killed the people in the National store, and that he said nothing in response. However, Lewis later testified police made her say: (1) appellant told her he had entered the National store because he worked there; and (2) appellant was silent when she asked him if he had killed "those people." Thus, Lewis admits having made those statements, but alleges they were coerced. We do not read *Oliver* to forbid the admission of a witness' prior inconsistent statements as substantive evidence when the witness at trial denies but also admits having made the statements. Accordingly, we find the statements Lewis both denied and admitted having made were properly admitted as substantive evidence.

■ Similarly, we find no reversible error in the admission as substantive evidence of the statements Lewis denied but never admitted having made to police. Lewis made two such statements, neither of which we find prejudicial. The first statement did not implicate appellant, and the other, "Marvin Jennings told me he had a job. He told me he had a job," is cumulative of other properly admitted evidence of appellant's employment at the National Supermarket.

■ In James Blankenship's videotaped statement to police, James related that on September 13, 1987, appellant, Donnie Blankenship and he were in the backyard of the home of appellant's sister. When Donnie went to the car for a minute, appellant told James "I think I killed them . . . that little boy at the National store." Appellant also described to him other details of the murder, including that Donnie Blankenship and he had made everybody lie down on the floor; that appellant glanced over and saw Donnie kill the security guard, who was jerking and throwing up; that Donnie reloaded the gun after shooting the security guard, and then shot all the other people; and that appellant thought that he, appellant, had shot the lady [Rose Beam].

At trial, like Sharon Lewis, James recanted much of what he had told the police. He testified that he had made up his statements to the police, based in part upon what he had learned about the case from the newspaper and television. He further testified that he had lied to the police because he was scared and did not want to put the blame on his own brother. James denied telling police parts of the conversation with appellant, including appellant's telling James anything about Donnie's shooting inside the National store or about "[t]he little dude that got shot and killed at the National food store robbery." However, James at earlier points in his testimony admitted having told police the substance of his conversation with appellant, including appellant's saying: (1) "I think I killed them . . . the little boy at the National store"; (2) appellant and Donnie made everybody lie down on the floor and they shot them; (3) appellant had assumed he shot the lady [Rose Beam]; (4) appellant

had seen Donnie shoot the security guard in the head, reload, and shoot all the other people; and (5) the security guard after he was shot was jerking and throwing up, with blood coming out of his mouth.

An edited version of James' statement was played for the jury; all of James' statements concerning his conversation with appellant appear to have been played. Because James at trial denied but also admitted having made the statements that related his conversation with appellant, we hold such statements were properly admitted as substantive evidence.

■ Like Lewis, James at trial denied but never admitted having made several other statements to police: (1) that appellant was supposed to leave town after the robbery-murders with Donnie Blankenship and Phil Harden; (2) that Donnie and appellant left town for another, more important reason than the funeral of James' uncle; and (3) that James saw Donnie, Marvin, or Leroy retrieve robbery money from Leroy's house. James also denied but never admitted having told police (1) how Donnie and appellant spent the robbery money; (2) who took the security guard's gun; and (3) what Donnie did with the gun or to whom Donnie gave the gun.

We are unable to glean from the record whether the statements James denied but never admitted having made were played for the jury as a portion of the videotape admitted into evidence, or whether the tape was edited so that these statements were excised. It appears from the state's closing argument that a fourth statement James denied but never admitted having made to police was included in the portion of the videotape shown to the jury. In the statement, James says, "Oh, I'm referring to Marvin Jennings" in response to a police officer's asking James to identify the "they" he was referencing when he stated that Marvin said "they" went into the National store and made the people lie down on the floor.

We cannot convict a trial court of error in the admission of evidence when we cannot determine from the record on appeal whether the evidence ever went before the jury. Nevertheless, we find no reversible error even if we assume the jury heard all the statements James denied but never admitted having made. Some of the statements did not implicate appellant, and those that did were incidental in comparison with the properly admitted statements concerning appellant's admissions of involvement in the robbery-murders. We find no reversible error.

■ Lastly, we consider the statements Leroy Blankenship denied having made to police. In Leroy's videotaped statement, he told police his brother Donnie had brought a gun and a large sum of money to Leroy's house about one week after the National Supermarket crimes. Leroy stated that the money was in a white plastic grocery bag, and that appellant, who was driving a gray, 1982 Cougar automobile, had dropped Donnie off at Leroy's house. Donnie said he had obtained the money from a dope house that he and appellant had robbed. Leroy described how the money was packaged with one-dollar bills wrapped in one-hundred-dollar bundles. Leroy further recounted a conversation that took place in his living room about four days after the National Supermarket murders: following a television news report about the National Supermarket crimes and in appellant's presence, Donnie told Leroy, "We was in that."

At trial, Leroy denied having made some of the statements to police. Specifically, he denied telling police that he saw appellant drop off Donnie. He also denied telling police that the plastic bag Donnie used to carry the money he left with Leroy was a "National" bag. Leroy further denied having made several other statements, but none directly implicated appellant, and appellant raises no specific claim of error with respect to their admission into evidence.

We find no reversible error in the admission as substantive evidence of the statements Leroy denied having made to police. The only statement directly implicating appellant that appellant claims was erroneously admitted was Leroy's statement that he saw appellant drop off Donnie when

Donnie went to Leroy's house to leave a gun and money. We do not find this statement so prejudicial as to amount to reversible error, in light of the other properly admitted statements strongly implicating appellant.

Importantly, appellant's assertion that he was denied the opportunity to cross-examine the witnesses about their statements' content and credibility is simply negated by the record. The record reflects that defense counsel vigorously cross-examined each of the three witnesses. Further, because we find no abuse of discretion in the trial court's permitting the jury to consider the prior inconsistent statements as substantive evidence, the trial court properly refused defense counsel's proffered instructions which would have limited consideration of such evidence to its bearing on the witnesses' believability. Likewise, any claim regarding the constitutional infirmity of § 491.074 RSMo 1986 has been rejected by our Missouri Supreme Court in *Bowman*, 741 S.W.2d at 13. Appellant's points three and five are denied.

■ Appellant's fourth point complains that the state's proof of his status as a prior offender was untimely. Appellant's case was submitted to the jury on September 9, 1988, which returned the following day with its verdict of guilty on all counts. The trial court did not enter its finding that defendant was a prior offender until the punishment phase began on September 13, 1988, pursuant to an amended information in lieu of indictment filed that same day by the circuit attorney. Appellant argues the record reflects noncompliance with the procedures established by § 558.021 RSMo 1986, so that the trial court lacked jurisdiction to sentence appellant as a prior offender and to remove sentencing from the jury on all counts other than murder first degree.

■ Section 558.021.2 RSMo 1986 expressly provides that in a jury trial a defendant's status as a prior, persistent or dangerous offender shall be pleaded, established and found, prior to submission to the jury and outside of its hearing. State law requires a finding of prior offender status prior to the case's going to the jury. *State v. McGowan*, 774 S.W.2d 855, 858 (Mo.App. 1989). In *McGowan*, the Western District of this court reiterated its dissatisfaction with prosecutorial laxity in complying with the timing provision of § 558.021.2 RSMo 1986 and warned that future violations would be dealt with harshly. *McGowan*, 774 S.W.2d at 858. We echo both the sentiment and admonition of *McGowan*.

■ Nevertheless, procedural errors in prior offender hearings do not warrant reversal unless defendant is shown to have been prejudiced. *State v. Kilgore*, 771 S.W.2d 57, 64 (Mo. banc 1989). We find *Kilgore* controlling of our decision. In *Kilgore*, as here, defendant was charged with first degree murder and other felonies. His request to sever the offenses was denied pursuant to § 565.004.3 RSMo 1986, which allows a defendant to be tried jointly for first degree murder and other offenses if he was charged and proven *before* trial to be a prior offender under chapter 558. *Kilgore*, 771 S.W.2d at 64. Proof of his prior offender status was conducted *after* the trial commenced, and defendant asserted that procedural irregularity as grounds for reversal. *Id.* Our Missouri Supreme Court held that such an error did not warrant reversal because the hearing on prior offenses, although held untimely, showed undisputably that defendant was a prior offender. *Id.*

We have also held that no prejudice inured to a defendant sentenced as a prior offender, even though the original indictment did not plead defendant as a prior offender and the substitute information charging him as a prior offender was void for failing to set out the basic charge. *Sanders v. State*, 790 S.W.2d 497, 499–500 (Mo.App.1990). In *Sanders*, we noted that defendant knew before trial the state intended to seek enhanced punishment and that defendant was not surprised or misled by the court's sentencing him as a prior offender. *Id.* at 500.

The circumstances here likewise disclose no prejudice. Near the conclusion of appellant's evidence on September 8, 1988, during a discussion in the judge's chambers on

the record and outside the jury's hearing, appellant acknowledged his decision not to testify. Appellant also acknowledged that if he were to testify, evidence of his prior conviction would be admitted. The trial court was apprised of appellant's status before the case was submitted to the jury. The court perceived no prejudice in having all counts sent to the jury for their determination, rather than having two arguments and two deliberations by the jury, the first for the first degree murder determinations on counts one through five and the second for the remaining eleven counts of assault, robbery and armed criminal action.

■ Although a breach of procedure, the failure during trial to heed the order the statute prescribes for the reception of that proof does not violate due process, and, therefore, will not invalidate the adjudication absent proof of prejudice. *Scharnhorst v. State,* 775 S.W.2d 241, 246 n. 4 (Mo.App.1989). In dicta, the *Scharnhorst* court further observed that the prior offender designation merely transposes the duty to sentence from the jury to the judge, but only within the limits permitted by law for that offense, and that there is no actual *enhancement* of punishment. *Id.* Thus, no due process concerns attach other than those which attend the trial of the offense itself. *Id.*

We discern no prejudice to appellant. He has shown none. The failure to prove prior offender status in a timely fashion was error, albeit harmless, and did not affect substantial rights. Point denied.

Appellant's sixth point avers that the trial court erred in denying appellant's motion of acquittal. He argues that the prior inconsistent statements of Sharon Lewis and James Blankenship were improperly admitted and that, absent their use, the evidence was insufficient to establish beyond a reasonable doubt that appellant was involved in the robbery and shootings at the National Supermarket.

■ In considering an appellant's attack on the sufficiency of the evidence to support a verdict, our role is not to weigh the evidence; rather, we are to determine whether sufficient evidence was presented at trial so that a reasonable person could have concluded the appellant is guilty as charged. *State v. Vitale,* 801 S.W.2d 451, 456 (Mo.App.1990). We accept as true all evidence tending to prove appellant's guilt, together with all reasonable inferences in support of the verdict. *Id.* Having earlier found the witnesses prior inconsistent statements either properly admitted or not prejudicial or plainly erroneous, we find the statements and other evidence already detailed sufficient to support appellant's convictions. We summarily deny appellant's sixth point.

■ Appellant's seventh point asserts the trial court erroneously excluded certain taped statements made to police officers by Ricky Williams. Williams had been questioned by the police during the initial investigation and, apparently, had admitted his participation and implicated others in the National Supermarket murders. In arguing on behalf of the admission of these statements, defense counsel focused on the threshold test for admissibility and stated the following to the trial court: Williams was unavailable as a witness; the statements were against his penal interests; and the statements were corroborated by other evidence and thus supported by sufficient indicia of reliability under *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). However, at no time during his argument to the trial court in support of the statements' admission did appellant's counsel specifically outline the contents of the taped statements. "When an objection to proffered evidence is sustained, the proponent of the evidence must make an offer of proof in order to preserve the matter for appellate review...." *State v. Schneider,* 736 S.W.2d 392, 401 (Mo. banc 1987), *cert. denied,* 484 U.S. 1047, 108 S.Ct. 786, 98 L.Ed.2d 871 (1988). A failure to make such an offer preserves nothing for our review. *Schneider,* 736 S.W.2d at 401; *State v. Foulk,* 725 S.W.2d 56, 66 (Mo.App.1987). Nevertheless, we review this point gratuitously.

■ Despite the lack of a specific offer of proof, we glean from the prosecutor's

argument opposing the admission of the statements that Williams had been taken into custody as a suspect during the initial investigation of the National Supermarket killings and questioned extensively by the police. Williams apparently made a statement denying any involvement and claiming he had heard about the crime from others. He then made a second statement admitting he had been present at the door of the National Supermarket store but claiming he had not entered during the commission of the crimes; in a third version, Williams admitted having been present inside the supermarket during the robbery.

 Generally, declarations against penal interest by a third party are not admissible as exceptions to the hearsay rule in criminal proceedings in Missouri. *State v. Turner*, 623 S.W.2d 4, 8 (Mo. banc 1981), *cert. denied*, 456 U.S. 931, 102 S.Ct. 1982, 72 L.Ed.2d 448 (1982); *State v. McCann*, 792 S.W.2d 890, 893 (Mo.App. 1990). However, such statements are admissible as a due process right if made under circumstances assuring their reliability. *McCann*, 792 S.W.2d at 893. Appellant must show the declarant is unavailable as a witness, there is substantial indicia of reliability of the alleged declaration, and the declaration, if true, would exonerate appellant. *State v. Dayringer*, 755 S.W.2d 698, 701–02 (Mo.App.1988). All prongs of this test must be satisfied in order for the declaration to be admitted into evidence. *Id.*

Appellant failed to demonstrate that Williams was unavailable. The record reflects no effort to produce Williams as a witness either voluntarily or by subpoena. Additionally, the prosecutor, although he had not talked to Williams personally, disclosed that he had located Williams at a job corps center in south central Missouri. Absent knowledge of the specific contents of Williams' statements, we are unable to divine whether such statements were in fact reliable or whether they exonerated appellant. As in *Turner*, the prosecutor's argument here intimates that the proffered evidence of Ricky Williams as the perpetrator

of the crime did not absolve appellant as a criminal participant. Appellant has failed to satisfy the *Dayringer* test, and his seventh point is denied.

 Appellant in his eighth point raises instructional error. He tendered an instruction submitting the issue of circumstantial evidence based on MAI–CR 3d 310.-02. The trial court refused to give appellant's proffered instruction.

 A judge must instruct on circumstantial evidence only if the evidence in the case is wholly circumstantial. *State v. Watkins*, 804 S.W.2d 859, 860 (Mo.App. 1991). A judge need not submit a circumstantial evidence instruction where both direct and circumstantial evidence exist. *State v. Griffin*, 662 S.W.2d 854, 857 (Mo. banc 1983), *cert. denied*, 469 U.S. 873, 105 S.Ct. 224, 83 L.Ed.2d 153 (1984). Circumstantial evidence is "evidence which does not directly prove a fact in issue, but gives rise to a logical inference that the fact exists." *State v. Fitzgerald*, 778 S.W.2d 689, 691 (Mo.App.1989). Direct evidence is "evidence which proves the existence of a fact in issue without inference or of that fact." *Id.* A criminal defendant's admissions are direct evidence of guilt. *Id.*

Appellant's statements to Sharon Lewis and James Blankenship of his own involvement in the robbery-murders are direct evidence of appellant's guilt. Because the state presented both direct and circumstantial evidence, the trial court's refusal to give the circumstantial evidence instruction proffered by appellant was not error. *See Griffin*, 662 S.W.2d at 857. Point denied.

Appellant's final two points concern his post-conviction appeal. He argues that he sufficiently pleaded factual allegations warranting an evidentiary hearing, and that the motion court's findings of fact and conclusions of law did not address each of the allegations raised by appellant in his *pro se* motion for post-conviction relief. We address each point in turn.

 To be entitled to an evidentiary hearing on the issue of ineffectiveness of counsel, a movant seeking relief under Rule 29.15 must plead facts, not conclu-

sions, which if true would warrant relief. *Barton v. State*, 802 S.W.2d 561, 562 (Mo. App.1991). The allegations must be unrefuted by the record, and the matters complained of must have prejudiced movant. *Id.* Where a prisoner's motion for post-conviction relief avers his lawyer rendered ineffective assistance of counsel for failing to present a witness at trial, the motion must state the facts to which the unproduced witness would have testified; if the prisoner fails to do so, the prisoner is not entitled to an evidentiary hearing. *Id.*

Appellant's amended motion listed the names and addresses of thirteen witnesses, including the three named in appellant's *pro se* motion, who would have testified appellant was in Louisiana the day after the National Supermarket crimes were committed. Further, the motion alleged that those witnesses would have testified appellant could not have been involved in the crimes on September 4, given the length of time it would have taken appellant to travel to Louisiana from St. Louis. The *pro se* motion stated that trial counsel had failed to call Myron Jennings and other defense witnesses appellant had endorsed at the time of trial; the amended motion alleged that defense counsel was aware of all these witnesses and their whereabouts. The *pro se* motion specifically summarized the substance of each of the three witnesses' testimony for appellant's alibi defense. Appellant's amended motion further stated that had these witnesses testified, appellant would have likely been acquitted.

The motion court denied an evidentiary hearing on the alibi issue, finding that "[m]ovant has not made the requisite allegations but rather has made only the conclusory allegation that his trial counsel knew of the witnesses and their whereabouts." Appellant's allegations do not precisely state that he informed trial counsel of these witnesses; however, the allegations reasonably permit the inference that counsel knew of the witnesses and their addresses. Nevertheless, the findings of the motion court are not clearly erroneous, in light of its additional finding that the

testimony from these witnesses would have been merely cumulative of other alibi evidence presented at trial.

Defense counsel elicited evidence of an alibi for his client through the testimony of Leroy Blankenship. Leroy testified that appellant, appellant's brother, and Donnie Blankenship were planning to leave for New Orleans sometime during the afternoon or evening of September 4. The testimony either of appellant's brother or of appellant's two girlfriends would have been cumulative, as the motion court found. Appellant's claim that he was prejudiced by the omission of these additional witnesses' testimony is refuted by the record; thus, under two prongs of *Barton*'s three-prong inquiry, no evidentiary hearing was required. Point denied.

Appellant's final point attacks the sufficiency of the motion court's findings of fact and conclusions of law because the court failed to address the nine allegations raised in appellant's *pro se* motion. Appellant's complaint with the motion court's judgment is well-founded. Although the motion court issued extensive findings of fact and conclusions of law disposing of each issue in appellant's amended motion, the court made no reference to appellant's *pro se* claims.

Rule 29.15(i) requires that the motion court issue findings of fact and conclusions of law on all issues presented, whether or not a hearing is held. However, appellant is entitled to a hearing on his claims only if he demonstrates prejudice. *State v. Stallings*, 812 S.W.2d 772, 779 (Mo.App.1991); *Robinson v. State*, 772 S.W.2d 770, 771 (Mo.App.1989). No error results from failure of the motion court to make findings of fact and conclusions of law on claims unsupported by substantive evidence or not cognizable in a Rule 29.15 proceeding. *Foster v. State*, 809 S.W.2d 863, at 865–66 (Mo.App.1991); *Kennedy v. State*, 771 S.W.2d 852, 855 (Mo.App.1989). We have reviewed each of appellant's *pro se* claims and find them either repetitive, refuted by the record, conclusory or without merit. Appellant has demonstrated no prejudice and we find none. An order by

this court remanding for further findings would be a useless act which is not required by the law. *Stallings,* at 779; *Townsend v. State,* 740 S.W.2d 328, 329 (Mo.App.1987).

The judgments of the trial court and motion court are affirmed in all respects.